**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROY JONES, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>PARTY CITY HOLDCO INC., MICHAEL A. CORREALE, JAMES M. HARRISON, THOMAS H. LEE PARTNERS, L.P., ADVENT INTERNATIONAL CORPORATION, GOLDMAN SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC and MORGAN STANLEY & CO. LLC,<br><br>     Defendants. | Case No. 15 Civ. 9080 (LAK)<br><br>**ECF CASE**<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

**CONSOLIDATED AMENDED COMPLAINT**
**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION .................................................................................................. 2

II.  JURISDICTION AND VENUE ......................................................................... 5

III.  PARTIES ............................................................................................................. 6

    A.  Lead Plaintiff .......................................................................................... 6

    B.  Defendants .............................................................................................. 6

        (i)  Party City ................................................................................... 6

        (ii)  Individual Defendants ............................................................... 7

        (iii)  Sponsor Defendants .................................................................. 7

        (iv)  Underwriter Defendants ........................................................... 10

IV.  FACTUAL BACKGROUND ........................................................................... 11

    A.  Party City's Business ............................................................................ 11

    B.  The *Frozen* Phenomenon .................................................................... 13

    C.  The IPO .................................................................................................. 15

    D.  Defendants' Post-IPO Admissions ...................................................... 17

V.  CLASS ACTION ALLEGATIONS ................................................................. 20

VI.  CAUSES OF ACTION UNDER THE SECURITIES ACT ............................ 22

    COUNT I:  For Violation of Section 11 of the Securities Act Against
Party City, the Individual Defendants, and the Underwriter Defendants ....................... 22

    COUNT II:  For Violation of Section 12(a)(2) of the Securities Act Against
Party City and the Individual Defendants ........................................................................ 25

    COUNT III:  For Violation of Section 15 of the Securities Act Against
the Individual Defendants and the Sponsor Defendants ................................................. 28

VII.  PRAYER FOR RELIEF .................................................................................... 30

VIII.  JURY TRIAL DEMANDED ............................................................................ 31

Lead Plaintiff, M. Erik Meinholz ("Lead Plaintiff") asserts strict liability and/or negligence claims against Defendants:  (i) Party City Holdco Inc. ("Party City" or the "Company"); (ii) Michael A. Correale ("Correale"); (iii) James M. Harrison ("Harrison"); (iv) Thomas H. Lee Partners, L.P. ("THL"); (v) Advent International Corporation ("Advent"); (vi) Goldman Sachs & Co. ("Goldman"); (vii) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"); (viii) Credit Suisse Securities (USA) LLC ("Credit Suisse"); and (ix) Morgan Stanley & Co. LLC ("Morgan Stanley") (collectively, "Defendants") for violations of Sections 11, 12(a)(2), and/or 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, on behalf of all persons and entities (the "Class") who purchased shares in or traceable to Party City's April 16, 2015 initial public offering ("IPO") of 25,156,250 shares of Party City common stock offered and sold pursuant to the registration statement on Form S-1 (File No. 333-193466), filed with the United States Securities and Exchange Commission ("SEC") on January 21, 2014, as amended ("Registration Statement"), and a prospectus on Form 424B4 dated April 15, 2015 and filed with the SEC on April 17, 2015 ("Prospectus") (collectively, the "Offering Documents").

Except as to allegations specifically pertaining to Lead Plaintiff and Lead Plaintiff's own acts, the allegations herein are based upon a continuing investigation by Lead Plaintiff's counsel, which includes, but is not limited to, the review and analysis of:  (i) Party City's public filings with the SEC; (ii) public reports and articles about Party City; (iii) transcripts of Party City's conference calls with securities analysts and investors; and (iv) Party City's press releases.

Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## I.    INTRODUCTION

1.    Operating more than 900 North American retail locations, 8 manufacturing facilities, and a global network of 11 distribution centers, Party City is the leading domestic retailer and world's largest supplier of both licensed and non-licensed party supplies, including costumes, balloons, decorations, gifts, and stationary.

2.    The strict liability and negligence claims alleged herein arise out of Party City's IPO on April 16, 2015, through which the Company sold more than 25 million shares of its common stock for approximately $392.2 million in net proceeds.

3.    The IPO was not Party City's first attempt at going public.  On April 22, 2011 (four years prior to the IPO), the Company filed a registration statement for the initial public offering of up to $350 million of common stock.  The Company, however, cancelled its earlier public offering efforts, opting instead for a private deal with Defendant THL in June 2012.

4.    Within two years of selling the majority of its shares to Defendant THL, Party City again sought to go public, filing the Registration Statement with the SEC on January 21, 2014.  At that time, the Company was in the midst of what Defendants later termed "the *Frozen* phenomenon," whereby *Frozen* licensed products were outselling any other licensed products that the Company had offered to date.  *Frozen* is an animated Disney motion picture that, upon its release in late 2013, became an instant hit.  Children of all ages flocked to see the movie and, thereafter, to stores to buy an array of *Frozen* merchandise.  *Frozen* was so popular that retailers could not keep *Frozen* merchandise in stock in late 2013 and early 2014.  The IPO was an opportunity for Party City to "cash in" on the unprecedented sales volume of the *Frozen* licensed products that the Company made available to consumers.

5.    As Defendant Harrison described ***after*** the IPO on the Company's August 13, 2015 earnings conference call ("August 13 Conference Call"), due to "the lack of [*Frozen*]

product availability early in 2014, combined with the growing popularity of this license,"
beginning early in the third quarter of 2014 ("3Q14"), Party City experienced a "cumulative
catch-up of demand," as customers rushed to buy licensed *Frozen* products.

6.     As a result of this "*Frozen* phenomenon" that led to extraordinary sales in 2014,
however, Party City faced the daunting challenge of trying to eclipse same-store comparable
sales ("Brand Comp Sales") (i.e., the percentage of revenue growth that a retailer achieves
relative to its sales in the prior year period) in 2015.  For example, Party City in 2015 was up
against Brand Comp Sales of 6.8%, 7.6%, and 5.8% for 3Q14, the fourth quarter of 2014
("4Q14"), and the fiscal year ended December 31, 2014 ("FY14"), respectively, due in large
part to strong sales of *Frozen* merchandise in 2014.

7.     While *Frozen* merchandise helped to drive Party City's impressive sales results
leading up to the IPO, the Offering Documents did not specifically mention *Frozen*, and
instead explicitly downplayed the impact of any particular cartoon, motion picture, or other
license on the Company's results, stating that "***[n]one of [Party City's] licenses is individually
material to our aggregate business***."

8.     After the issuance of the Offering Documents containing this assurance of
diversification among Party City's product offerings and the completion of the IPO, the market
expressed optimism that Party City would deliver healthy sales results in 2015 notwithstanding
*Frozen's* positive effect on the prior year's Brand Comp Sales.  For example, on May 26, 2015,
analyst JPMorgan wrote:  "We expect ***comps to remain solid for Party City despite lapping
tough comparison in the back half*** [of 2015] (6.8% in 3Q and 7.6% in 4Q)" because, among
other reasons, "***we expect a shift to other brands and labels that underperformed at the
expense of Frozen last year***."

9.      Likewise, on July 1, 2015, JPMorgan echoed Defendants' assurances in the Offering Documents that Party City was sufficiently diversified, such that a decline in sales of goods tied to one license would not materially affect the Company's business.  Specifically, in response to concern over how Party City would respond to the decline in *Frozen* sales, JPMorgan wrote: "***We disagree with the notion that sales are driven by hit products***." Similarly, analyst Morgan Stanley reported on August 3, 2015:  "While compares get more difficult as PRTY cycles a strong Halloween, aided by Frozen related merchandise, ***we think the license pipeline is strong enough to offset last year's solid results*** (key licenses include Cinderella, Star Wars, Minions, and Ant-Man)."

10.     Yet contrary to the statement in the Offering Documents that "[n]one of [Party City's] licenses is individually material to our aggregate business[,]" Defendants belatedly admitted that *Frozen* was having a material impact on the Company's financial condition at the time of the IPO.  For example, Defendants acknowledged on the August 13 Conference Call that Party City faced "challenges" in the second half of 2015 due to "the impact of the year-over-year lapping ***of the extraordinary performance of the Disney Frozen franchise from last year***."  Similarly, during the Company's presentation at the September 9, 2015 Goldman Sachs Global Retailing Conference (the "September 9 Conference"), Defendant Harrison discussed the importance to Party City of *Frozen* merchandise sales prior to the IPO, noting that "***Frozen was such a phenomenon*** that moms were buying Frozen simply because it was Frozen, not because of a specific party."  Thus, unlike "traditional" movie licenses, which "don't generally move the needle on party goods," the "***Frozen phenomenon went beyond that***."

11.     Further, Party City's President, Gregg Melnick ("Melnick") admitted on the Company's November 12, 2015 earnings conference call ("November 12 Conference Call")

that *"last year's Frozen phenomenon created an anomaly in our business*," which impacted the Company's "costume, dress-up and party" segments, as customers "wanted to buy products incorporating the *Frozen* images and themes because of the popularity of the franchise and not necessarily because they were having a celebration."  In other words, and contrary to the representations in the Offering Documents, the *Frozen* license **was** material to Party City's business at the time of the IPO.

12.     As a result of the untrue statements and omissions of material fact alleged herein, Lead Plaintiff and other Class members have suffered damages for which Defendants are liable pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act.

## II.     JURISDICTION AND VENUE

13.     The Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.  This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act and 28 U.S.C. § 1331.

14.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1391(b).  Acts giving rise to the violations of law complained of herein occurred in this District.  In addition, at the time that this action was commenced, the Company was headquartered in Elmsford, New York.

15.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange and market.

III.    **PARTIES**

A.      **Lead Plaintiff**

16.     Lead Plaintiff, M. Erik Meinholz, purchased Party City common stock in or traceable to the IPO pursuant to the Offering Documents, as reflected in the certification attached hereto as Exhibit A and alleged below in ¶¶ 48, 87, and suffered damages as a result of the violations alleged herein.

B.      **Defendants**

(i)     **Party City**

17.     Defendant Party City is a Delaware corporation with its headquarters located at 80 Grasslands Road, Elmsford, New York 10523.  According to its quarterly report on Form 10-Q filed with the SEC on November 13, 2015 for the period ending September 30, 2015 (the "3Q15 Form 10-Q"), Party City is a retailer and distributor of decorated party goods, including decorative paper and plastic tableware, decorations, accessories, and balloons.  The Company sells retail party goods at approximately 900 party superstores, including approximately 210 franchised stores, in the United States and Canada under the "Party City" banner.  The Company also sells such products through its primary e-commerce website, PartyCity.com.  In addition, the Company operates a network of over 300 temporary Halloween retail locations under the "Halloween City" banner.

18.     As alleged below in ¶¶ 76, 88, Party City, among other things:  (i) was the issuer of the common stock sold in the IPO pursuant to the Registration Statement; (ii) was the offeror and/or solicitor of sales of the common stock offered and sold in the IPO pursuant to the Prospectus; (iii) conducted a road show presentation for prospective investors in connection with the IPO in April 2015 (the "Road Show"); and (iv) entered into the Underwriting Agreement attached as Exhibit 1.1 to the Company's amended registration statement on Form

S-1/A filed with the SEC on March, 27, 2015 (the "Underwriting Agreement") with the Underwriter Defendants (defined herein) and the following additional underwriters in the IPO for whom the Underwriter Defendants were acting as representatives:  (i) Barclays Capital Inc.; (ii) Deutsch Bank Securities Inc.; (iii) J.P. Morgan Securities LLC; (iv) William Blair & Company, L.L.C.; (v) Stephens Inc.; and (vi) Telsey Advisory Group LLC ("TAG") (collectively, the "Additional Underwriters").

### (ii)    Individual Defendants

19.    Defendant Correale is the Company's Chief Financial Officer ("CFO").   In connection with the IPO, Defendant Correale reviewed, approved, and signed the Registration Statement and participated in the Road Show.

20.    Defendant Harrison is the Company's Chief Executive Officer ("CEO"), President, and a member of the Company's Board of Directors (the "Board").  In connection with the IPO, Defendant Harrison reviewed, approved, and signed the Registration Statement and participated in the Road Show.

21.    Defendants Correale and Harrison are collectively referred to herein as the "Individual Defendants."

### (iii)    Sponsor Defendants

22.    Defendant THL is a private equity firm headquartered in Boston, Massachusetts. With respect to Defendant THL and Defendant Advent (collectively, the "Sponsor Defendants"), the Company stated in the Prospectus:  "The Sponsor[] [Defendants] have significant influence over corporate transactions.  So long as investment funds associated with or designated by the Sponsor[] [Defendants] continue to own a significant amount of the outstanding shares of our common stock, even if such amount is less than 50%, the Sponsor[] [Defendants] will continue to be able to strongly influence or effectively control our decisions,

regardless of whether or not other stockholders believe that the transaction is in their own best interests."

23.     At the time of the IPO, Defendant THL owned 100% of THL PC Topco, L.P., which in turn owned approximately 69% of Party City's common stock.  Upon completion of the IPO, Defendant THL, through THL PC Topco, L.P., indirectly beneficially owned approximately 54.6% of Party City's outstanding common stock, and together with Defendant Advent, through Advent-Party City Acquisition Limited Partnership, indirectly beneficially owned approximately 73.4% of Party City's outstanding common stock.  As a result, Party City was a "controlled company" within the meaning of the corporate governance standards of the New York Stock Exchange ("NYSE"), and the Sponsor Defendants "continue[d] to be able to strongly influence or effectively control [Party City's] decisions."  Moreover, a portion of the net proceeds from the IPO were used to pay a $30.7 million termination fee to the Sponsor Defendants pursuant to their management agreement with Party City.  Finally, under the Stockholder Agreement dated July 27, 2012, by and among Party City Holdco Inc. (formerly PC Topco Holdings, Inc.), THL PC Topco, L.P., Advent-Party City Acquisition Limited Partnership, American Greetings Corporation and the Persons listed as Management Holders on the signature pages thereto, which was incorporated by reference in the Registration Statement (the "Stockholders Agreement"), Defendant THL was entitled to designate up to five members of the Company's Board.  Pursuant to the Stockholders Agreement, Todd M. Abbrecht, Joshua M. Nelson, and Uttam Jain served as Defendant THL's designated directors on the Company's Board at the time of the IPO.

24.     Defendant Advent is a private equity firm headquartered in Boston, Massachusetts.  With respect to Defendant Advent, together with the other Sponsor Defendant,

THL, the Company stated in the Prospectus:  "The Sponsor[] [Defendants] have significant influence over corporate transactions.  So long as investment funds associated with or designated by the Sponsor[] [Defendants] continue to own a significant amount of the outstanding shares of our common stock, even if such amount is less than 50%, the Sponsor[] [Defendants] will continue to be able to strongly influence or effectively control our decisions, regardless of whether or not other stockholders believe that the transaction is in their own best interests."  At the time of the IPO, Defendant Advent owned 100% of Advent-Party City Acquisition Limited Partnership, which in turn owned approximately 23.8% of Party City's common stock.  Upon completion of the IPO, Defendant Advent, through Advent-Party City Acquisition Limited Partnership, indirectly beneficially owned approximately 18.8% of Party's City's outstanding common stock, and together with THL, through THL PC Topco, L.P., indirectly beneficially owned approximately 73.4% of Party City's outstanding common stock. As a result, Party City was a "controlled company" within the meaning of the corporate governance standards of the NYSE, and the Sponsor Defendants "continue[d] to be able to strongly influence or effectively control [Party City's] decisions."  A portion of the net proceeds from the IPO were used to pay a $30.7 million termination fee to the Sponsor Defendants pursuant to their management agreement with Party City.

25.     Under the Stockholders Agreement, Defendant Advent was entitled to designate: (i) two members of the Company's Board for so long as it owned more than 50% of the shares that it held immediately following the consummation of the Subscription Agreement with the Company dated July 27, 2012 ("Advent Subscription Agreement") and 4% of the Company's outstanding common stock; or (ii) one member of the Company's Board for so long as it owned more than 25% but less than 50% of the shares that it held immediately following the

consummation of the Advent Subscription Agreement and more than 2% but less than 4% of the Company's outstanding common stock.  Advent's holdings of common stock at the time of the IPO satisfied the first of the two foregoing requirements.  Pursuant to the Stockholders Agreement, Jefferson M. Case and Steven J. Collins served as Defendant Advent's designated directors on the Company's Board at the time of the IPO.

### (iv)   Underwriter Defendants

26.   Defendant Goldman was an underwriter of and seller in the IPO.  In this capacity, Defendant Goldman was responsible for ensuring the truthfulness and accuracy of the statements contained in the Offering Documents. Defendant Goldman sold 5,475,535 shares of Party City common stock, in the IPO at the offering price of $17.00 per share pursuant to the Underwriting Agreement.

27.   Defendant Merrill Lynch was an underwriter of and seller in the IPO.  In this capacity, Defendant Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the statements contained in the Offering Documents.  Defendant Merrill Lynch sold 5,475,535 shares of Party City common stock in the IPO at the offering price of $17.00 per share pursuant to the Underwriting Agreement.

28.   Defendant Credit Suisse was an underwriter of and seller in the IPO.  In this capacity, Defendant Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in the Offering Documents.  Defendant Credit Suisse sold 3,780,662 shares of Party City common stock in the IPO at the offering price of $17.00 per share pursuant to the Underwriting Agreement.

29.   Defendant Morgan Stanley was an underwriter of and seller in the IPO.  In this capacity, Defendant Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in the Offering Documents.  Defendant Morgan

Stanley sold 3,780,662 shares of Party City common stock in the IPO at the offering price of $17.00 per share pursuant to the Underwriting Agreement.

30.     Defendants Goldman, Merrill Lynch, Credit Suisse, and Morgan Stanley are referred to collectively herein as the "Underwriter Defendants."  The Underwriter Defendants acted as lead book-running managers and representatives of the Additional Underwriters in the IPO.

## IV.     FACTUAL BACKGROUND

### A.     Party City's Business

31.     Founded in 1947 under the name Amscan Holdings, Inc. ("Amscan"), Party City originated as an importer and wholesaler of decorated party supplies before expanding into manufacturing in 1986.  In 2005, Amscan acquired Party City Corporation and its retail network of stores.  Since then, through additional retail acquisitions and organic store growth, Party City has expanded to become the leading domestic retailer and world's largest vertically integrated supplier of decorated party goods.

32.     On April 22, 2011, Party City filed a registration statement with the SEC in connection with a planned initial public offering of up to $350 million of its common stock.  In June 2012, however, the Company decided to remain privately owned, selling the majority of its shares to Defendant THL and subsequently withdrawing its initial public offering.

33.     Less than two years after cancelling its first planned initial public offering, Party City filed its IPO Registration Statement with the SEC.  In the Registration Statement and later-filed Prospectus, Party City attributed its "leading market position" primarily to the Company's "differentiated, vertically integrated business model."  The Company further claimed that it benefitted from product diversification, driven by the ability of its in-house design team to "effectively respond to changes in consumer trends," "consistently introduce

innovative items," and "drive[] newness" in the Company's licensed and unlicensed products, resulting in a "broad selection of continuously updated and innovative merchandise at a compelling value."

34.     Accordingly, numerous analysts initiating coverage on the Company on May 26, 2015 (after Party City had raised approximately $392 million in the IPO) highlighted Party City's diversified license business as critical to its success.  For example, analyst Telsey Advisory Group ("TAG") noted:  "Although consumers tend to be brand-agnostic when shopping for party goods, *they do care about licensed product* . . . .  Encouragingly, *Party City's strengths* – product development, retail knowledge, sourcing, and quality control – *ensure the company is able to regularly introduce new licensed product as well as acquire additional license programs*."

35.     Similarly, analyst William Blair & Company ("William Blair") wrote:  "One of the keys to sustaining wholesale and retail market share in the party goods business is the attainment of licenses to manufacture products for popular brands.  While Party City already maintains a large collection of manufacturing and distribution licenses, adding to the portfolio of brands is essential to maintaining and expanding its market position."

36.     Also commenting on the benefits of Party City's diversified product offerings, particularly with respect to new licensed products, analyst Deutsche Bank stated:  "We believe *PRTY has the drivers in place to sustain low to mid single digit comparable brand sales* (including the impact of ecommerce) *through 2019* including[,]" among other things, "[c]ontinued strategic SKU proliferation through new product launches and *new licensed-product wins*."  In addition, Deutsche Bank noted: "It is in this regard where we see vertical integration and the company's market leading position on the retail side *helping to drive*

12

*revenues*, as ***PRTY is quickly becoming the go-to player in the market for licensing partners***."

37.     Analyst Credit Suisse likewise emphasized that Party City's "***licensed product is often a differentiator and another example of the company's power within the industry***[,]" as "PRTY generated over 13% of its total sales and 33% of its wholesale sales from licensed product" while "PRTY's scale has enabled it to secure some of the best on-trend licenses in the business, including those with Disney, Mattel, Nick, and Marvel, among others."

38.     According to analyst Morgan Stanley, "***[t]hird party licensed goods are a key to PRTY's sales pipeline*** at $250 million of retail & wholesale sales (11% of total sales)."

39.     Finally, describing the Company's license business as a "***magical elixir***," analyst JPMorgan reported that "Party City's success as a leading retailer and wholesaler with growing scale ***makes it the licensor of choice for leading brands***, such as Disney, NFL and the NBA[,]" while its "vertically integrated model offers licensing partners leading product development capabilities."

### B.     The *Frozen* Phenomenon

40.     Less than two years after withdrawing its first planned initial public offering in July 2012, Party City geared up for its second attempt to go public by filing the Registration Statement on January 21, 2014.  Critically, and unbeknownst to investors at the time of the IPO, the success of Party City's licensed goods in 2014 was due in large part to what Defendants later referred to as the "***Frozen* phenomenon**."

41.     As noted above, *Frozen* was released in theaters nationwide in November 2013. The film's success transcended movie ticket sales, and included retail products, as customers rushed to stores in droves to purchase licensed *Frozen* merchandise.  Indeed, the demand was so high that retailers could not keep *Frozen* goods in stock in early 2014.  In this regard, the

*New York Times* wrote in a May 16, 2014 article titled, "**Kids Are Icebound by Frozen Fervor: Disney's Animated Film 'Frozen' Has Some Children Obsessed**," that "**[p]arents are using words like 'obsessed' and 'cultlike' to describe the force with which the film is capturing little hearts and minds unlike any in recent memory**."  The article further disclosed, "**[w]ith stores across the country sold out of the most coveted merchandise**, desperate parents are turning to eBay, where, according to Bloomberg News, **an original Elsa dress was recently offered for $1,600**."

42.    Also describing the unprecedented popularity of *Frozen*, *The Wall Street Journal* reported in a February 4, 2015 article titled, "'Frozen' Performs for Disney – Merchandise Tied to Animated Blockbuster Continues to Buoy Media Firm's Results," following Disney's November 2013 release of the animated musical "Frozen," the company's consumer-products division was initially "caught flat-footed by the massive consumer demand for anything and everything 'Frozen.'"  As a result, "there weren't nearly enough products on store shelves to sate Anna- and Olaf-crazy children until well into 2014."

43.    As a supplier of Disney merchandise, Party City attempted to capitalize on what it termed "the *Frozen* phenomenon" in late 2014.

44.    For example, in a September 29, 2014 press release titled "Party City Reveals 2014's Hottest Halloween Styles:  *Go Beyond The Basic Costume To Mix It, Match It, Make It Your Own*," the Company touted its line of *Frozen* costumes as follows:

> Everyone's favorite movie "Frozen" melted the hearts of parents and children nationwide.  Widely considered the most popular princess of 2014, Elsa is capturing the imagination of little girls, creating a flurry of demand for the royal sisters of Arendale.  To create a customized Frozen character, Party City's Disney Princess Boutique is the best resource for enchanting costume accessories, providing endless options to standout.  Combine the Elsa tutu dress with turquoise long gloves and sequin leg warmers and pair alongside the Anna tutu dress, satin cape and auburn braided wig for a Halloween full of sisterly love.  ***The popularity***

14

*of these costume accessories isn't frozen in time either, little princesses will be playing dress up with statement pieces all year long.*

45.     Likewise, images of *Frozen* licensed merchandise prominently appeared in Party City's April 2015 Road Show presentation juxtaposed with statements touting the Company's: (i) "[i]nvestment [h]ighlights[;]" (ii) year-over-year earnings; and (iii) status as the "[l]argest vertically integrated supplier and retailer of decorated party goods globally," "[l]argest global designer, manufacturer, and distributor of decorated party supplies and costumes," "[l]argest manufacturer of metallic balloons in the world," and "#1 party goods retailer in North America."

### C.     The IPO

46.     Capitalizing on Party City's enormous success in selling *Frozen* licensed products in 2014, the Company completed the IPO of 25,156,250 shares of common stock at $17.00 per share on April 21, 2015, including the exercise in full of the underwriters' option to purchase 3,281,250 additional shares.  The IPO was made pursuant to the Registration Statement filed with the SEC on January 1, 2014 and the Prospectus filed on April 17, 2015.

47.     The Registration Statement was signed by each of the Individual Defendants.  As set forth below in ¶¶ 76, 78, 88-89, Party City, the Individual Defendants, and the Underwriter Defendants offered, sold, and/or solicited sales of the shares of Party City common stock in the IPO.

48.     As set forth above at ¶¶ 26-30, the Underwriter Defendants were underwriters and sellers in the IPO and acted as lead book-running managers and representatives of the Additional Underwriters in the IPO.  Lead Plaintiff used its own funds to purchase 10,000 shares of Party City common stock in or traceable to the IPO pursuant to the Offering Documents on April 16, 2015.

49.     While taking advantage of the *Frozen* "phenomenon" in its business leading up to the IPO, Party City said *nothing* of the sales-driving license in the Offering Documents. Rather, the Registration Statement represented just the opposite, stating in pertinent part with respect to Party City's product licenses:

> We hold numerous intellectual property licenses from third parties, allowing us to use various third-party cartoon and other characters and designs on our products, and the images on our metallic balloons and consumers are principally covered by these licenses. ***None of these licenses is individually material to our aggregate business.***

50.     This statement was repeated in the Prospectus filed on April 17, 2015.

51.     Based upon this assurance in the Offering Documents, the market expressed optimism that the Company could continue to deliver healthy sales results notwithstanding the impact of *Frozen* on the prior year's results.

52.     For example, after the Company's financial results for the first quarter of 2015 were issued on May 14, 2015, JPMorgan wrote on May 26, 2015:  "In 1Q14, wholesale growth was largely flat before accelerating to 13% in 2Q, 15% in 3Q, and 7% in 4Q.  Licenses, ***and more specifically Frozen***, was a key driver of this, and comparisons are admittedly challenging in the back half as Party City laps comps of 6.8% in 3Q and 7.6% in 4Q.  ***We estimate that Frozen added ~200 bps to comps to sales in 2014***."  Nevertheless, JPMorgan noted:  "We expect ***comps to remain solid for Party City despite lapping tough comparison in the back half*** (6.8% in 3Q and 7.6% in 4Q)" because, among other reasons, "customers will continue to have parties, and ***we expect a shift to other brands and labels that underperformed at the expense of Frozen last year***, including Hello Kitty and Barbie."  JPMorgan further stated on July 1, 2015 that although "license sales are roughly 20% of total sales (retail and wholesale), with Disney the largest licensor at >$100MM[,] ***[w]e disagree with the notion that sales are driven by hit products*** and point to the improving performance of licenses, including Barbie,

Hello Kitty, and Mickey Mouse as examples," as well as the fact that "Party City has excellent relationships with its licensors and certain license popularity tends to be en vogue at various times."

53.     Similarly, Morgan Stanley reported on May 26, 2015:  "Of the $250 million wholesale licensed sales, ***Disney was by far the largest licenses at 39% more than the next four largest licenses combined***[,]" and "[d]ue to the success of licensed goods in 2014, ***mainly Frozen related***, ***total sales spiked 9%*** compared to flattish and 2% growth over the prior two years."  Despite *Frozen's* impact on Party City's total sales in 2014, Morgan Stanley further stated:  "Currently, PRTY has the licensing rights to all Star Wars products.  With Star Wars: Episode VII – The Force Awakens due out in December of this year, ***we expect PRTY will be able to sustain solid growth as it cycles a successful Halloween (partially driven by Frozen)***."  Reiterating this view on August 3, 2015, Morgan Stanley commented:  "While compares get more difficult as PRTY cycles a strong Halloween, aided by *Frozen* related merchandise, ***we think the license pipeline is strong enough to offset last year's solid results*** (key licenses include Cinderella, Star Wars, Minions, and Ant-Man)."

     **D.**    **Defendants' Post-IPO Admissions**

54.     The statement in the Offering Documents set forth above in ¶¶ 49-50 concerning Party City's product licenses was untrue and/or omitted material facts because *Frozen's* impact was so material to Party City's business in the second half of 2014 that it could not be offset by Party City's other licenses in the second half of 2015.

55.     As Defendant Harrison disclosed on the August 13 Conference Call, the Company expected to face certain "challenges" in the next quarter, including "lapping sales of licensed Disney Frozen product, which had ***strong initial load and demand***" in 2014.  Further, while Defendant Harrison claimed that the Company was not typically "***susceptible to the volatility***

*associated with trends or fads*," that was not the case with respect to *Frozen*.  In this regard, Defendant Harrison explained that "in the case of the ***very successful Disney Frozen franchise***, the lack of product availability early in 2014, combined with the growing popularity of this license, ***resulted in cumulative catch-up of demand in early [3Q14] as customers rushed to buy the product.***"  Defendant Harrison also stated on the same call that the Company anticipated sales from its licensed business to be softer than its own expectations for the following quarter due to the impact of "***just Frozen***."

56.     Likewise, Defendant Correale explained on the August 13 Conference Call that in 2Q15, the Company had already begun to experience *Frozen's* impact on its Brand Comp Sales, which had increased by only 1.2%, versus an increase of 4.7% in the second quarter of 2014, noting that "in the month of June . . . we began to experience the impact of the year-over-year lapping of the ***extraordinary performance of the Disney Frozen franchise from last year***."

57.     In response to these statements made during the August 13, Conference Call, Morgan Stanley commented on August 13, 2015 that "***there may be a bigger than perceived hangover from the success of Frozen merchandise in the back half***" of 2015.

58.     Nevertheless, the market still did not fully appreciate *Frozen's* impact on the prior year's results, and continued to believe that the Company's putative product diversification would provide insulation, as Credit Suisse wrote on August 14, 2015 that despite tempered expectations for 3Q15 "due to some sales softness and less margin expansion anticipated," Party City's "story is multi-dimensional, with many drivers on both the retail and wholesale side supporting the solid earnings growth and helping navigate through volatility."   On

September 8, 2015, JPMorgan also observed that "the company has multiple discrete drivers to offset *Frozen* against tough backhalf compares."

59.     However, as Defendants revealed at the September 9 Conference, *Frozen's* impact on Party City's business was a "**phenomenon**":

> **Frozen was such a phenomenon that moms were buying Frozen simply because it was Frozen, not because of a specific party**.  And where that became most evident to us . . . is the day we comped against the day last year, when we sent out an e-mail blast saying Frozen costumes, Elsa and Anna costumes now available at PartyCity.com.  We comped that one day.  **We looked at the gross number and said what the heck happened.**

60.     Melnick then chimed in:  "Before lunchtime was *a few hundred thousand dollars in one day* after the e-mail went out."

61.     Further describing *Frozen's* extraordinary impact, Defendant Harrison stated: "[H]istorically, . . . on the party side of the business, **movies don't generally move the needle on party goods** . . . .  I mean the one . . . exception to that would be Lion King[,] [which] had a lot of legs and had a lot of longevity in the marketplace.  **The Frozen phenomena went beyond that**."

62.     Finally, on the November 12 Conference Call, Defendants disclosed more details regarding the impact of *Frozen* licensed products on Party City in 2014.  Specifically, in explaining the significant **decline** in Party City's 3Q15 Brand Comp Sales of **3.6%**, with **250 bps** attributed to lapping *Frozen* sales in 3Q14, Melnick stated:

> **[L]ast year's Frozen phenomenon created an anomaly in our business.**  As a party specialty retailer, our consumers generally come to our stores as a destination purchaser of party supplies in connection with a specific celebration or party.  However, last year's traffic included shoppers with a different motivation.  **Moms wanted to buy products incorporating the Frozen images and themes because of the popularity of the franchise and not necessarily because they were having a celebration.**

63.     Defendant Harrison further described the Company's disappointing 3Q15 results on the November 12 Conference Call, stating that "*the Frozen phenomenon*" impacted three business segments: "costume, dress-up and party[,]" whereas other licenses in the Company's pipeline, such as Star Wars, would likely impact only the party segment.

64.     As a result, Melnick acknowledged that the Company "significantly underestimated [Frozen's] impact[,]" which "was probably as much as 150 basis points above what we had originally anticipated" for 3Q15.

65.     In short, while the Offering Documents created the misleading impression that Party City could sustain its impressive sales growth in 2014 as customer demand shifted from *Frozen* to other licensed products, Defendants' subsequent admissions revealed that because customers were not purchasing *Frozen* products in lieu of other licensed merchandise, Party City's other "traditional" licenses did not underperform at the expense of *Frozen* and were therefore ***not*** strong enough to offset the "anomaly" of *Frozen's* material impact on the Company's financial performance.  Thus, contrary to the statement in the Offering Materials set forth above in ¶¶ 49-50, Party City's license for *Frozen* images was individually material to the Company's aggregate business.

66.     As of November 17, 2015, the last trading day prior to filing of this action, Party City's shares closed at $11.80, a decline of $5.20 per share, or more than 30%, from the IPO price of $17.00 per share.  Lead Plaintiff and other members of the Class have suffered damages.

## V.     CLASS ACTION ALLEGATIONS

67.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all other persons and entities that purchased shares of Party City common stock sold in the IPO pursuant to the Offering

Documents.  Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has or had a controlling interest, or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

68.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable, as Class members purchased approximately 25 million shares of Party City common stock pursuant to the Offering Documents.  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of Class members can be ascertained from the books and records of Party City and/or its transfer agent.  Notice can be provided to Class members by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

69.    Lead Plaintiff will fairly and adequately represent and protect the interests of the other Class members.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and Lead Plaintiff intends to prosecute this action vigorously.

70.    Lead Plaintiff's claims are typical of the claims of all other Class members because Lead Plaintiff's and all other Class members' claims arise from the same untrue statements and omissions of material fact made by, or chargeable to, Defendants.  Lead

Plaintiff does not have any interests antagonistic to, or in conflict with, the interests of the Class.

71.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek individual redress for the wrongful conduct alleged herein.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

    a)  whether the federal securities laws were violated by the acts of Defendants as alleged herein;

    b)  whether Defendants' statements issued in the Offering Documents were untrue or omitted material facts; and

    c)  the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## VI.     CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I:

**For Violation of Section 11 of the Securities Act Against
Party City, the Individual Defendants, and the
Underwriter Defendants**

73.     Lead Plaintiff repeats and realleges each of the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

74.     This claim is brought against the Company, the Individual Defendants, and the Underwriter Defendants pursuant to Section 11 of the Securities Act, 15, U.S.C. § 77k, on behalf of Lead Plaintiff and all other Class members who purchased shares of Party City common stock in or traceable to the IPO pursuant to the Registration Statement.

75.     The Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above in ¶¶ 49-50, 54-65.

76.     Party City was the registrant and issuer of the common stock pursuant to the Registration Statement.  As the issuer of the common stock, Party City is strictly liable to the members of the Class who purchased Party City common stock in or traceable to the IPO pursuant to the Registration Statement, which contained the untrue statements and omissions of material fact alleged herein.

77.     Each of the Individual Defendants signed the Registration Statement.  The Individual Defendants acted negligently and are therefore liable to members of the Class who purchased shares of Party City common stock in or traceable to the IPO pursuant to the Registration Statement.

78.     The Underwriter Defendants, along with the Additional Underwriters, were the underwriters of the IPO.  The Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased shares of Party City common stock in or traceable to the IPO pursuant to the Registration Statement.

79.     Each of the Defendants named in this Count owed to purchasers of Party City common stock in or traceable to the IPO the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, and any incorporated

documents, at the time that such documents became effective to ensure that the statements therein were true and that there were no omissions of material fact which rendered any of the statements therein materially untrue or misleading.

80.     None of the Defendants named in this Count made a reasonable investigation to assure themselves that the statements contained in the Registration Statement were true, did not omit any material facts, and were not misleading.  Accordingly, the Defendants named in this Count acted negligently and are therefore liable to Lead Plaintiff and to the other members of the Class who purchased Party City common stock in or traceable to the IPO pursuant to the Registration Statement.

81.     Lead Plaintiff and other members of the Class purchased Party City common stock in or traceable to the IPO pursuant to the Registration Statement, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

82.     Lead Plaintiff and other members of the Class who purchased Party City common stock in or traceable to the IPO pursuant to the Registration Statement suffered damages as a result of the untrue statements and omissions of material fact in the Registration Statement, as they either:  (i) sold these shares at prices below the IPO price of $17.00 per share; or (ii) still held shares as of November 17, 2015, the last trading day prior to the filing of this action, when the price of Party City common stock was lower than the IPO offering price of $17.00 per share.

83.     The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

84.     This claim is brought within the applicable statute of limitations because less than one year elapsed from the time that Lead Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based and the time that this claim was first brought.  Less than three years elapsed from the time that the shares of Party City common stock were sold to Lead Plaintiff and to other Class members in the IPO pursuant to the Registration Statement and the time that this claim was first brought.

85.     By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

## COUNT II:

### For Violation of Section 12(a)(2) of the Securities Act
### Against Party City and the Individual Defendants

86.     Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

87.     This claim is brought against Party City and the Individual Defendants pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77(a)(2), on behalf of Lead Plaintiff and all other members of the Class who purchased Party City common stock in or traceable to the IPO pursuant to the Prospectus.  Lead Plaintiff used its own funds to purchase 10,000 shares of Party City common stock in or traceable to the IPO pursuant to the Prospectus on April 16, 2015.

88.     Party City was an offeror and/or solicitor of sales of the 25,156,250 shares of Party City common stock offered and sold in the IPO pursuant to the Prospectus, which contained untrue statements of material fact or failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above in ¶¶ 49-50, 54-65.  Specifically, Party City solicited

25

purchases of Party City common stock to be sold by means of the Prospectus by, among other things:  (i) conducting the IPO; (ii) announcing the pricing of the IPO in a Company press release issued on April 15, 2015 (the "April 15, 2015 Press Release"); (iii) actively drafting, revising, and/or submitting for approval the Prospectus, pursuant to which the IPO was made to the investing public; and (iv) conducting the Road Show, through which Party City touted, among other things, its "unique vertically-integrated operating model," competitive strengths, growth strategy, and "superior" financial performance.    Moreover, in the Underwriting Agreement, Party City agreed with each of the Underwriter Defendants and the Additional Underwriters to, among other things:  (i) prepare and file the Prospectus; (ii) prepare and file an amended prospectus or prospectus to correct any misstatement or omission contained in the Prospectus; and (iii) with respect to the Company shares being sold pursuant to the Prospectus, (a) take such action as necessary to qualify them for offering and sale under applicable securities laws, (b) pay required filing fees relating to them, and (c) use its best efforts to list them on the NYSE.

89.    The Individual Defendants each solicited the sale of shares of Party City common stock offered and sold in the IPO pursuant to the Prospectus, which contained untrue statements of material fact or failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above in ¶¶ 49-50,54-65.  Specifically, the Individual Defendants solicited purchases of Party City common shares to be sold by means of the Prospectus by, among other things:  (i) signing and/or participating in the preparation of the Registration Statement; and (ii) participating in the Road Show, through which they touted, among other things, Party City's

"unique vertically-integrated operating model," competitive strengths, growth strategy, and "superior" financial performance.

90.     Lead Plaintiff and other members of the Class purchased shares of Party City common stock in or traceable to the IPO pursuant to the Prospectus, and did not know, or in the exercise of reasonable care could not have known, of the untrue statements and omissions of material fact contained therein.

91.     Members of the Class who purchased the shares of Party City common stock in or traceable to the IPO pursuant to the Prospectus are entitled to rescissory damages on any shares so purchased, but no longer held.  Members of the Class who purchased the shares of Party City common stock in or traceable to the IPO pursuant to the Prospectus, and who still hold any such shares, have sustained damages as a result of the untrue statements and omissions of material fact in the Prospectus, for which they hereby elect to rescind and tender all such shares of Party City common stock to the Defendants sued in this Count in return for the consideration paid for such shares, together with interest thereon pursuant to Section 12(a)(2) of the Securities Act.

92.     None of the Defendants named in this Count made a reasonable investigation to assure themselves that the statements contained in the Prospectus were true, did not omit any material facts, and were not misleading.  Accordingly, the Defendants named in this Count acted negligently and are therefore liable to Lead Plaintiff and to the other members of the Class who purchased Party City common stock in or traceable to the IPO pursuant to the Prospectus.

93.     The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

94.     This claim is brought within the applicable statute of limitations because less than one year elapsed from the time that Lead Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based and the time that this claim was first brought.  Less than three years elapsed from the time that the shares of Party City common stock were sold to Lead Plaintiff and to other Class members in the IPO pursuant to the Prospectus and the time that this claim was first brought.

95.     By virtue of the foregoing, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.

## COUNT III:

### For Violation of Section 15 of the Securities Act Against the Individual Defendants and the Sponsor Defendants

96.     Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

97.     This Count is asserted against the Individual Defendants and the Sponsor Defendants for violating Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all other members of the Class who purchased Party City common stock in the IPO issued pursuant to the Offering Documents, and this Count is premised upon Party City's primary violations of Sections 11 and 12(a)(2) of the Securities Act.

98.     At the time of the filing of the Offering Documents and the IPO, Defendant Corrreale served as CFO of Party City, and Defendant Harrison served as Party City's CEO and President and a member of the Company's Board.

99.     The Sponsor Defendants were controlling shareholders of Party City, owning approximately 93% of the Company's common stock at the time of the IPO.  As the Company admitted in the Prospectus:   "The Sponsor[] [Defendants] have significant influence over corporate transactions.   So long as investment funds associated with or designated by the Sponsor[] [Defendants] continue to own a significant amount of the outstanding shares of our common stock, even if such amount is less than 50%, the Sponsor[] [Defendants] will continue to be able to strongly influence or effectively control our decisions, regardless of whether or not other stockholders believe that the transaction is in their own best interests."

100.     The Individual Defendants and the Sponsor Defendants, prior to and at the time of the IPO, participated in the day-to-day operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Party City's business affairs, including the registration of its securities.  As officers and/or controlling shareholders of a publicly owned company, the Individual Defendants and the Sponsor Defendants had a duty to disseminate accurate and truthful information with respect to Party City's business, financial condition, and results of operations, including its proposed sale of common stock. The Individual Defendants and the Sponsor Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO.  Among other things, the Individual Defendants and five directors designated by the Sponsor Defendants signed the Registration Statement.  In addition, by virtue of their status as controlling shareholders of the Company, the Sponsor Defendants were able to exercise significant influence and/or control over Party City's corporate transactions and decisions, as the Company admitted in the Prospectus.

101.     Because of their respective positions of control and authority as senior officers and/or controlling shareholders of Party City, the Individual Defendants and the Sponsor

Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information.

102.    By reason of the aforementioned conduct, the Individual Defendants and the Sponsor Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Party City is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiff and other members of the Class who purchased Party City common stock in or traceable to the IPO pursuant to the Offering Documents.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on behalf of himself and the other members of the Class, prays for relief and judgment, including:

A.      Determining this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedures, certifying Lead Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

B.      Awarding compensatory and/or rescissory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D.      Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.      Awarding such other and further relief as may be just and proper.

## VIII.   JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  April 26, 2016                                     Respectfully Submitted,

                                          **KESSLER TOPAZ**
                                          **  MELTZER & CHECK, LLP**

                                          /s/ *Johnston de F. Whitman, Jr.*
                                          Andrew L. Zivitz
                                          Johnston de F. Whitman, Jr.
                                          Meredith L. Lambert
                                          280 King of Prussia Road
                                          Radnor, PA 19087
                                          Telephone: (610) 667-7706
                                          Facsimile: (610) 667-7056
                                          azivitz@ktmc.com
                                          jwhitman@ktmc.com
                                          mlambert@ktmc.com

                                          *Counsel for Lead Plaintiff M. Erik*
                                          *Meinholz and the Proposed Class*