UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
ROY JONES, et al.,

                Plaintiffs,


     -against-                                                                             15-cv-9080 (LAK)


PARTY CITY HOLDCO, INC., et al.,

                Defendants.
------------------------------------------------x

## MEMORANDUM OPINION

Appearances:

| | |
|---|---|
| Naumon A. Amjed | Mark C. Hansen |
| Ryan T. Degnan | David L. Schwarz |
| Andrew L. Zivitz | Joshua D. Branson |
| Johnston de F. Whitman, Jr. | KELLOGG, HUBER, HANSEN, TODD, EVANS & |
| Meredith L. Lambert | FIGEL, P.L.L.C. |
| KESSLER TOPAZ MELTZER & CHECK, LLP | |
| | *Attorneys for Defendants Party City Holdco* |
| *Attorneys for Plaintiffs* | *Inc., Thomas H. Lee Partners, L.P., Michael A.* |
| | *Correale, and James M. Harrison* |
| | |
| | James P. Smith III |
| | Robert Y. Sperling |
| | Joseph L. Motto |
| | WINSTON & STRAWN LLP |
| | |
| | *Attorneys for Defendants Goldman, Sachs &* |
| | *Co., Merrill Lynch, Pierce, Fenner & Smith* |
| | *Incorporated, Credit Suisse Securities (USA)* |
| | *LLC, and Morgan Stanley & Co. LLC* |

Matthew Solum
Elliot C. Harvey Schatmeier
KIRKLAND & ELLIS LLP

Stuart M. Glass
CHOATE HALL & STEWART LLP

*Attorneys for Defendant Advent
International Corporation*

LEWIS A. KAPLAN, *District Judge.*

This putative class action[1] arises out of statements made in connection with Party City's initial public offering on April 16, 2015. The Consolidated Amended Complaint (the "CAC") alleges violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.[2] The matter is before the Court on defendants' motions to dismiss the CAC for failure to state a claim upon which relief may be granted.

*Facts*

*The Parties*

M. Erik Meinholz is Lead Plaintiff on behalf of the putative class.[3]

Defendant Party City Holdco Inc. ("Party City" or the "Company") is a global party

---

[1] Meinholz brings this action "on behalf of all persons and entities . . . who purchased shares in or traceable to Party City's April 16, 2015 initial public offering ('IPO') of 25,156,250 shares of Party City common stock offered and sold pursuant to [various offering documents]." Compl. [DI 51] at 1. The Court assumes for the purposes of this motion the truth of the well-pleaded factual allegations of the complaint.

[2] 15 U.S.C. §§ 77k, 77l(a)(2), 77o.

[3] DI 37.

goods retailer and supplier.[4]  During the relevant period, defendant Michael A. Correale was the Company's chief financial officer, and defendant James M. Harrison was the chief executive officer.[5]

Plaintiffs sue also two beneficial owners of Party City common stock—Thomas H. Lee Partners, L.P. ("THL") and Advent International Corporation—and Party City's underwriters: Goldman Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse Securities (USA) LLC, and Morgan Stanley & Co. LLC.[6]

*Party City's Business*

Party City is the country's largest retailer and world's largest distributor of licensed (*e.g.*, products featuring movie characters) and non-licensed party supplies, including costumes, balloons, decorations, and tableware.[7]  Party City generates revenue from wholesale and retail operations, with retail sales representing a higher proportion of the Company's revenue.[8]

Party City's retail strategy consists of offering customers a "broad selection of continuously updated and innovative merchandise at a compelling value" through approximately

---

[4] DI 51 ¶ 17.

[5] DI 51 ¶¶ 19-20.

[6] DI 51 ¶¶ 22-30.

[7] DI 51 ¶ 1.

[8] DI 90 at 3-4.

4

900 superstores, an online website, and over 300 temporary Halloween stores.[9] To that end, the Company maintains a large collection of manufacturing and distribution licenses so that it regularly may introduce new products to "effectively respond to changes in consumer trends."[10] Although Party City sells non-licensed products as well, its ability to manufacture products for popular brands, such as Disney, Marvel, and the NFL, has been key to its industry success.[11]

*The* Frozen *"Phenomenon"*

In November 2013, Disney released the movie *Frozen*, which became a worldwide sensation.[12] Not only did the film generate impressive ticket sales, but "customers rushed to stores in droves to purchase licensed *Frozen* merchandise."[13] Demand for the film's merchandise was so high that Disney initially was "caught flat-footed by the massive consumer demand for anything and everything 'Frozen'"; there were not enough products on the shelves to meet customer demand "until well into 2014."[14]

Plaintiffs allege that Party City, as a supplier of Disney merchandise, "attempted to

---

[9] DI 51 ¶ 17.

[10] DI 51 ¶ 33.

[11] *See* DI 51 ¶¶ 34-39.

[12] DI 51 ¶ 41.

[13] DI 51 ¶ 41.

[14] DI 51 ¶ 42 (internal quotation marks omitted) (quoting *'Frozen' Performs for Disney – Merchandise Tied to Animated Blockbuster Continues to Buoy Media Firm's Results*, Wall St. J., Feb. 4, 2015).

5

capitalize on what it termed 'the *Frozen* phenomenon' in late 2014" by, for example, promoting its line of *Frozen* costumes for Halloween and including prominent images of *Frozen* merchandise in an investor presentation.[15]

*The IPO*

In 2011, Party City had filed a registration statement with the Securities Exchange Commission in connection with a planned initial public offering ("IPO"). Ultimately, however, it did not go public and instead sold a majority of its shares to THL in a private deal.[16]

A few years later, on January 21, 2014, Party City filed another registration statement for a planned IPO of 21,875,000 shares of its common stock.[17] In a subsequently filed prospectus, the Company touted its "differentiated, vertically integrated business model" and stated its belief that its "superior selection of party supplies, scale, innovation and service position [it] for future growth across all of [its] channels."[18] Party City completed the IPO on April 21, 2015, at $17.00 per share, with the underwriters exercising their option to purchase additional shares.[19]

---

[15] DI 51 ¶¶ 43-45.

[16] DI 51 ¶ 32.

[17] DI 51 at 1; DI 89-1 at 8. In addition, Party City granted the underwriters an option to purchase up to 3,281,250 additional shares. DI 89-1 at 8.

[18] DI 89-4 at 3.

[19] DI 51 ¶ 46.

*The Alleged Misstatement or Omission*

Plaintiffs allege that, "unbeknownst to investors at the time of the IPO, the success of Party City's licensed goods in 2014 was due in large part to what Defendants later referred to as the '*Frozen* phenomenon.'"[20] Even though the *Frozen* "phenomenon" contributed to Party City's success leading up to the IPO, the Company allegedly "said nothing of the sales-driving license in the Offering Documents."[21] In fact, Party City, plaintiffs contend, represented the opposite by stating in the Registration Statement and Prospectus:

> "We hold numerous intellectual property licenses from third parties, allowing us to use various third-party cartoon and other characters and designs on our products, and the images on our metallic balloons and c[ostumes] are principally covered by these licenses. *None of these licenses is individually material to our aggregate business*."[22]

Plaintiffs allege that the statement that none of Party City's third-party licenses individually was material to its aggregate business was materially false or misleading because "*Frozen*'s impact was so material to Party City's business in the second half of 2014 that it could not be offset by Party City's other licenses in the second half of 2015."[23] Plaintiffs contend that Party City admitted in post-IPO statements that *Frozen*'s impact on its business was a "phenomenon" and an "anomaly" that led to significant decline in Party City's "brand comp

---

[20] DI 51 ¶ 40 (emphasis omitted).

[21] DI 51 ¶ 49 (emphasis omitted).

[22] DI 51 ¶ 49 (emphasis in original).

[23] DI 51 ¶ 54.

sales"—*i.e.*, the year-over-year or quarter-over-quarter change in retail sales from Party City's stores and online website.[24] In sum, plaintiffs claim that

> "while the Offering Documents created the misleading impression that Party City could sustain its impressive sales growth in 2014 as customer demand shifted from *Frozen* to other licensed products, Defendants' subsequent admissions revealed that because customers were not purchasing *Frozen* products in lieu of other licensed merchandise, Party City's other 'traditional' licenses did not underperform at the expense of *Frozen* and were therefore *not* strong enough to offset the 'anomaly' of *Frozen*'s material impact on the Company's financial performance."[25]

Thus, plaintiffs argue, *Frozen* in fact was material to Party City's business, and any Company statements suggesting otherwise were false or misleading.[26]

On the last day of trading before plaintiffs filed their complaint, Party City's shares closed at $11.80, down from the IPO price of $17.00 per share.

*Discussion*

"Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions."[27] Section 11 applies to registration

---

[24] DI 51 ¶¶ 54-66; DI 51 ¶ 6 (defining "brand comp sales"); DI 89-2 at 14 n.10 (clarifying scope of "brand comp sales").

[25] DI 51 ¶ 65.

[26] DI 51 ¶ 65.

[27] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).

statements, Section 12(a)(2) to prospectuses and oral communications, and Section 15 creates liability for certain "control persons."[28]

In order to state a sufficient claim under Section 11, a plaintiff must allege that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading.'"[29]

Section 12(a)(2) requires a plaintiff to allege that: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"[30]

Section 15 imposes liability on individuals or entities that "control[] any person liable" under Sections 11 and 12.[31] Thus to establish Section 15 liability, "a plaintiff must show a 'primary violation' of" Sections 11 and 12 "and control of the primary violator by defendants."[32]

---

[28] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 716, 720 (S.D.N.Y. 2013).

[29] *Morgan Stanley*, 592 F.3d at 358-59 (quoting 15 U.S.C. § 77k(a)).

[30] *Id.* at 359 (quoting 15 U.S.C. § 77l(a)(2)).

[31] *Id.* at 358.

[32] *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).

For each Securities Act claim, then, a plaintiff first must allege adequately a material misstatement or omission.[33] Here, plaintiffs are unable to do so. Accordingly, the CAC must be dismissed in its entirety.

I. *Material Misstatement*

To state a claim under Section 11 or 12(a)(2) on the basis of a false statement, plaintiffs must allege that Party City's registration statement or prospectus "contained an untrue statement of a material fact."[34] Plaintiffs contend that Party City's statement that "[n]one of [our third-party] licenses is individually material to our aggregate business" was false because "*Frozen*'s impact was so material to Party City's business in the second half of 2014 that it could not be offset by Party City's other licenses in the second half of 2015."[35] Essentially, plaintiffs assert that it is plausible to infer from Company statements "demonstrating the unprecedented role and impact that *Frozen* played in Party City's business leading up to the IPO" that the statement in question was false at the time it was made. The argument is unpersuasive.

---

[33] For a misstatement or omission to qualify as material, "there must be a substantial likelihood that a complete and truthful disclosure would have been viewed by [a] reasonable investor as having significantly altered the total mix of information made available." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)). To dismiss a complaint on the basis of lack of materiality, the alleged misstatement or omission must be "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). The Court assumes without deciding that plaintiffs have alleged adequately materiality at this stage in the proceedings.

[34] 15 U.S.C. §§ 77k(a), 77l(a).

[35] DI 51 ¶ 54.

10

As an initial matter, defendants claim that plaintiffs' case "rests on an implausible, out-of-context reading of the alleged misstatement."[36] Plaintiffs, they argue, read "Party City's statement not as a discussion of intellectual property risks, but as an implied promise of sustained 'impressive sales growth.'"[37] Such a reading is implausible, defendants contend, because the alleged misstatement—"which appears in sections of the Offering Documents discussing intellectual-property rights and risks"—"said nothing about sales figures . . . and suggested nothing about retail demand for licensed products."[38]

While it is axiomatic that "a statement or omission must be considered in context,"[39] it is true also that the Court "draw[s] all reasonable inferences in the plaintiff's favor" on a motion to dismiss.[40] Certainly the alleged misstatement could be interpreted, as defendants urge, simply as "a statement about the possible risks Party City would face should it lose one or more of its product licenses."[41] But it is plausible to infer too that the statement implied something about Party City's sales. As the prospectus made clear, Party City acquires third-party licenses so that it may sell

---

[36] DI 90 at 13.

[37] DI 90 at 15.

[38] DI 90 at 15.

[39] *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (internal quotation marks omitted) (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993)).

[40] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-cv-0256 (LAK), 2016 WL 6652731, at *7 (S.D.N.Y. Nov. 10, 2016) (internal quotation marks omitted) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

[41] DI 90 at 13 n.7.

products bearing those images or marks.[42] In other words, these third-party licenses represent some quantity of sales because an integral part of Party City's business is selling licensed products to customers. In consequence, it is reasonable to infer a related conclusion from the alleged misstatement: that the sales attributed to any single Party City license were not material to the Company's aggregate business.

Even drawing all reasonable inferences in plaintiffs' favor, however, they have not alleged adequately that the alleged misstatement was false—in other words, that *Frozen* in fact was material to Party City's aggregate business. To be sure, they allege that *Frozen* merchandise was very popular and a big seller. But just because the Company described *Frozen*'s performance as "extraordinary," "anomalous," or "phenomen[al]" does not mean that it had a material impact on the Company's *aggregate* business. As defendants point out, the CAC contains no allegations about the total amount of *Frozen*-licensed sales in 2014 or the percentage those sales represented of Party City's aggregate business. Instead, plaintiffs rely on a handful of buzz words and a single financial metric, brand comp sales. Yet they fail to allege any connection between that metric and the Company's aggregate business. In short, plaintiffs offer no facts from which the Court plausibly could infer that *Frozen* sales were material to Party City's business as a whole. For that reason, plaintiffs have failed to allege that the Company's registration statement or prospectus contained a material misstatement.

---

[42] DI 89-2 at 88 ("We hold numerous intellectual property licenses from third parties, allowing us to use various third-party cartoon and other characters and designs on our products, and the images on our metallic balloons and costumes are principally covered by these licenses.").

## II.     Materially Misleading Omission

Sections 11 and 12(a)(2) impose liability also when a registration statement or prospectus omits to state a material fact necessary to make the statements therein not misleading.[43] "The test for whether a statement is materially misleading . . . is . . . whether [the defendants'] representations, viewed as a whole, would have misled a reasonable investor."[44]

Plaintiffs contend that "Party City's representation that none of its 'licenses is individually material to [its] aggregate business' was materially misleading by omitting that the 'phenomenal' and 'anomalous' success of Party City's *Frozen* merchandise was in fact critical to the Company's business leading up to the IPO."[45]  As explained above, however, the CAC does not allege adequately that *Frozen* in fact was material to Party City's aggregate business.  Accordingly, no reasonable investor could have been misled by the challenged statement given that the CAC lacks any factual allegations that call the statement's accuracy into question.[46]   In consequence, plaintiffs have failed to allege an actionable omission.

## III.    Section 15 Claims

Having failed to plead a primary violation under Section 11 or 12(a)(2), plaintiffs' Section 15 claims too must be dismissed.

---

[43]   *City of Westland*, 129 F. Supp. 3d at 88.

[44]   *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004).

[45]   DI 94 at 13.

[46]   *See In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 511-12 (S.D.N.Y. 2010).

*Conclusion*

Defendants' motions to dismiss the CAC [DI 85, 88] are granted.

SO ORDERED.

Dated:	February 1, 2017

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)